## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:24-CR-00181-JEB** |
| | ) | |
| **ROBERT COPPOTELLI,** | ) | |
| | ) | |
| *Defendant.* | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### I.    INTRODUCTION

Robert Coppotelli comes before this Court humbled and deeply remorseful for his actions on January 6, 2021 (hereinafter "January 6") and appears for sentencing following his acceptance of responsibility upon entering a plea of guilty to one count of Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) and one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Mr. Coppotelli respectfully submits this Memorandum in Aid of Sentencing.

With a large community of support surrounding him and considering his work ethic and a lifetime of charitable giving, Mr. Coppotelli is sure to turn the page on this dark chapter in his life. Mr. Coppotelli was inside the U.S. Capitol for twelve (12) minutes total, from 2:24 p.m. until 2:36 p.m., and he did not engage in any violence or destruction of property while inside or throughout the events of January 6. *See* Presentence Investigation Report (hereinafter "PSR") at ¶¶ 14-19. Further, he has been on pretrial release since February 20, 2024, and has been completely compliant. *See* PSR at ¶ 5. Based upon his personal history and characteristics, the nature and

1

circumstances of the offense, his lack of criminal history, the minuscule likelihood of recidivism, and the need to avoid unwarranted sentencing disparities, Mr. Coppotelli respectfully requests that the Court impose a term of probation, as such as sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

## II.    MR. COPPOTELLI'S BACKGROUND

Mr. Coppotelli is a twenty-eight-year-old (28) entrepreneur with no criminal history and a charitable and generous spirit. PSR at ¶¶ 23-28, 30, 38; *see also* Exhibit A – Robert Coppotelli's Charitable Giving. He has two older sisters and currently lives with his parents in Toms River, New Jersey. *See* PSR at ¶¶ 30, 33. His father owns and operates a construction company and his mother is a homemaker. *Id*. at ¶ 30. Mr. Coppotelli had a middle-class upbringing and experienced major relocations at ages five (5) and eleven (11) when his family moved from Florida to Las Vegas, and then from Las Vegas to Toms River, respectively. *Id*. at ¶ 32. Mr. Coppotelli is single and has no children and no prior significant relationships. *Id*. at ¶ 33. He maintains close relationships with his family members, and they remain steadfast in their support of him during this case. *Id*. at ¶ 31.

In 2014, at eighteen (18) years of age, Mr. Coppotelli obtained his diploma from Toms River High School North and began working full-time at his business, Coppotelli Equities. *Id*. at ¶ 38. His company purchases, refurbishes, and sells heavy equipment. *Id*. He also owns a clothing company, Proud to Be Clothing Co., which donates ten percent (10%) of its net proceeds to charity. *See* Exhibit A. Mr. Coppotelli and his businesses are known in the community for being charitable. *See* Exhibits A - M. In recent years, he has donated thousands of dollars and truckloads of toys to

2

Children's Specialized Hospital, and, out of appreciation, the hospital named a Psychology Therapy Room after him.  *See* Exhibit A.

Mr. Coppotelli's close family and friends describe him as a hard worker, selfless and generous, a productive member of society with a good heart, someone who takes care of those around him, and is a great role model for his nieces and nephews.  *See* Exhibits C-M.  Those who know him best describe Mr. Coppotelli's actions on January 6 as an aberration and mistake in an otherwise good man's life.  *Id.*

### III.    THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE[1]

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 39 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors . . . make an individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and explain how the facts relate to the purpose of sentencing.  *Id.* at 53-60; *see also Pepper v. United States*, 562 U.S. 476 (2011).  The Court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *Pepper*, 562 U.S. at 493 (internal quotations omitted).

---

[1] Although the United States Sentencing Guidelines do not apply to the specific offenses to which Mr. Coppotelli pleaded guilty, this discussion is still relevant in its description of the Court's role in sentencing.

To ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy.  Because "the Guidelines are now advisory…, as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")).

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."  *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  *United States v. Forman*, 436 F.3d 638, 644, n.1 (6. Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2nd Cir. 2006).

## IV.    APPLICABLE U.S. SENTENCING GUIDELINES RANGE

The United States Sentencing Guidelines ("USSG" or "Guidelines") do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction. Accordingly, the Guidelines do not apply to either count of which Mr. Coppotelli pleaded guilty. *See* PSR at ¶ 47. Further, Mr. Coppotelli does not have any prior juvenile adjudications, adult criminal convictions, pending charges, prior arrests, or any other criminal conduct to report to this Court. *Id.* at ¶¶ 23-28. As to counts three and four, the maximum term of imprisonment is six months per count. *Id.* at ¶ 46. Because this offense meets the definition of a "petty offense," a term of supervised release is not applicable. *Id.* at ¶ 50. Mr. Coppotelli is eligible for up to five (5) years of probation on each count because the offenses are misdemeanors, and multiple terms of probation shall run concurrently. *Id.* at ¶¶ 52-53. Per statute, the maximum fine is Five Thousand dollars ($5,000) per count. *Id.* at ¶ 60. Mr. Coppotelli has already agreed to pay restitution in the amount of Five Hundred dollars ($500) to the Architect of the Capitol. *Id.* at ¶ 20.

## V.    18 U.S.C. § 3553(a) FACTORS

### A.    The Nature and Circumstances of the Offense

Mr. Coppotelli's conduct and involvement in the instant offense is beyond regrettable. In his letter to the Court, he describes January 6 as "one of the saddest days in the history of The United States and ultimately divided a nation pushing fellow Americans against each other." *See* Exhibit B. Following his actions on January 6, he experienced deep sadness and anxiety, struggled to eat or sleep, and he could not understand where he went wrong in life. *Id.* "[M]y life was in shambles." *Id.* However, as is his nature, he found he could not remain in that dark

5

place for long and, instead, admitted his mistakes, took "100% responsibility" for his actions, and looked to making a better future for himself. *Id*. January 6 brought him closer to God, "ultimately re-sparking a flame to complete [he] lifelong goal of helping as much and as many people as [he] possibly can." *Id*.

Mr. Coppotelli pleaded guilty to two misdemeanor counts, entered the U.S. Capitol, and chanted "storm the gates," but his conduct must be scrutinized in the context of both the events of the day and his individual conduct. And when analyzed under this lens, Mr. Coppotelli submits his conduct does not warrant a sentence of incarceration. In no way excusing Mr. Coppotelli's conduct, it is important to note that Mr. Coppotelli only entered the U.S. Capitol for twelve (12) minutes but perhaps more importantly, was not violent towards anyone and did not damage or destroy any property. Additionally, Mr. Coppotelli was not engaged in dangerous political rhetoric via social media and did not come to the Capitol with any weapons or prepared for battle. Nevertheless, Mr. Coppotelli knows he should not have been there that day and should have never entered the Capitol.

Mr. Coppotelli describes himself as a man who does his "best each and every day to learn from [his] mistakes, grow from [his] mistakes and try to be a better man each and every day." *Id*. He strives to be a good role model to his seven nieces and nephews – his "pride and joy." *Id*. When he was a child, he wanted to be a multimillionaire when he grew up, but it was not until his teenage years that he realized his desire for money was rooted in an even deeper desire to have enough resources to be charitable and to help others in need. *Id*. In describing this realization, Mr. Coppotelli writes, "helping someone in need, making their day in turn made me

reciprocally happy putting a smile on my face and that is when the puzzle pieces started fitting together for me." *Id*.  In recent years, Mr. Coppotelli has made numerous charitable donations to Children's Specialized Hospital and other local organizations.  *See* Exhibit A.  His plan is to continue trying to make the world a better place and being the "asset I know I can be to the community and society as a whole." *See* Exhibit B.

### B.    Mr. Coppotelli's Personal History and Characteristics

Mr. Coppotelli is deeply admired for his love of family, work ethic, and generous and charitable nature, as evidenced by the eleven (11) letters of support submitted on his behalf.  *See* Exhibits C-M.

Dr. Chari Robynne Chanley is a Superintendent of Schools and Mr. Coppotelli's aunt and mother figure.  *See* Exhibit C.  Throughout his entire life, she has seen him make "good choices and always put others first."  *Id*.  Altruism is one of his major defining characteristics and she admires his dedication to making donations and volunteering with the Children's Specialized Hospital.  *Id*.  He is the kind of person that does good without any expectation of receiving something in return.  *Id*.  In her role as an educator, she has come to believe "people are not perfect and as long as they mean no harm, I believe in second chances and looking beyond the error and looking more at the person."  *Id*.  In this spirit, she encourages the Court to see Mr. Coppotelli as an altruistic man of honor who made an error in judgment when fashioning a sentence in this case. *Id*.

Lexah Abdurachmanov is an educator and one of Mr. Coppotelli's older sisters.  *See* Exhibit D.  She describes her brother as a person with values "grounded in kindness, integrity, and a

7

commitment to bettering the lives of others." *Id*. As a child, he was known as gentle, compassionate, humble, and someone who could empathize with vulnerable people. *Id*. She has seen him perform acts of kindness that he carries out quietly, like spending quality time with their elderly neighbor, helping a homeless person during a rainstorm, providing her family with financial assistance during a trying time, assisting a local woman with house projects after her husband had passed away, and bringing treats and surprises for his nieces and nephews. *Id*. She has witnessed his many charitable acts done through his business and describes how she recently saw two goals he had written on his bathroom mirror: "Create World Peace" and "End World Hunger." *Id*. She knows that Mr. Coppotelli was devastated and regretful for his actions on January 6, that he was "so sorry" for his conduct. *Id*. She is proud of how he has responded to this mistake, becoming an "even stronger warrior for kindness and charity," and she is confident "he will continue to grow, rectify his mistakes, and make the world a more peaceful, loving, and kind place to be." *Id*.

Taylah Hoben is a former courts employee and another one of Mr. Coppotelli's older sisters. *See* Exhibit E. She describes him as a fun and loving uncle, a hard worker, and a generous donor to many charities. *Id*. "When Rob is not working you can normally find him with the family at one of our houses eating and laughing with the children, visiting with his friends and their families or helping someone in someway with something …." *Id*. He is an excellent example of being a "helping hand" in the world, which is a value they were taught as kids. *Id*. She has never seen him in trouble and sees his actions on January 6 as a "lapse in judgment" which he repents for daily. *Id*. She asks this Court for leniency in sentencing and asks that the Court determine a sentence based on the totality of his life and not just a singular moment in time. *Id*.

Dr. Jordyne Chanley is Mr. Coppotelli's cousin and lifelong best friend. *See* Exhibit F. "Robert is one of the most special and kind-hearted individuals I have ever met … His integrity, altruism, and selflessness has been his inherent nature since he was a little boy." *Id*. She thinks of him as someone who would go out of his way to assist any person in need and his generosity has helped numerous family members and community organizations. *Id*. "He adds value and gives back to his family, community, and society; a part of the greater good for which we need more in this world." *Id*. She believes his actions on January 6 are not indicative of who he truly is, which is a person who "does the right thing when no one is looking." *Id*.

Matthew Fiorello is a former high school classmate and friend to Mr. Coppotelli. *See* Exhibit G. He reflects on how pivotal Mr. Coppotelli was to his early success in his landscape business. *Id*. Mr. Coppotelli would always answer the phone and give him business advice and even gifted him a new toolbox for his truck when Mr. Fiorello needed one. *Id*. Mr. Coppotelli is "positive, motivating, and truly has a heart of gold." *Id*. He jumped at the opportunity to write a character letter for this Court's consideration because it pains him that Mr. Coppotelli's character would ever be in question. *Id*. "Rob is the most law-abiding rule-following person I know" and his actions on January 6 are "extremely" outside of his character. *Id*. He knows Mr. Coppotelli "takes full responsibility for his actions and blames only himself." *Id*.

Captain Kevin Arnold is a retired Captain of the Island Heights Police Department and someone who has done business with Mr. Coppotelli for years. *See* Exhibit H. The allegations against Mr. Coppotelli "came as a surprise" to him, as breaking the law is outside of his character. *Id*. He applauds Mr. Coppotelli's community outreach and believes he has learned his lesson. *Id*.

Captain Arnold asks this Court for leniency at sentencing, stating, "[i]t is my personal and professional opinion having been in law enforcement for over 27 years that Mr. Coppotelli is a much more productive asset to society and makes it better as a whole …." *Id*.

Bill George is an eighty-three-year-old veteran who served in the United States Army from 1963 to 1969. *See* Exhibit I. A few years ago, he went through hard times and was on the verge of losing everything he owned and becoming homeless. *Id*. Somehow, Mr. Coppotelli "caught wind" of his situation and told him that "everything is going to be ok." *Id*. Mr. Coppotelli proceeded to provide him financial assistance with no strings attached and "has been there every step of the way I needed him," from helping when his car broke down, getting him clothes, paying his phone bill, moving his stuff to storage, or giving him money for food. *Id*. He considers Mr. Coppotelli "truly a special person" and asks this Court to be lenient in sentencing considering "all the good he has to offer, and all the positivity he adds to the community as a whole." *Id*.

Rabbi Tuvia Steinharter is the Dean of a nonprofit elementary school, Cheder Tiferes Yisroel, at which Mr. Coppotelli has been a volunteer. *See* Exhibit J. He says Mr. Coppotelli "has made a significant impact" at the school and has "consistently gone above and beyond to help our school and its students, particularly those who are struggling." *Id*. He describes how Mr. Coppotelli assists the school with things such as mentoring, organizing events, and providing financial assistance. *Id*. He calls Mr. Coppotelli a "role model" for children and asks this Court for leniency in sentencing, as Mr. Coppotelli has reflected "a commitment to bettering our community and helping those in need." *Id*.

Robert Dietlmeier is an educator and has been a close friend to Mr. Coppotelli for nearly two decades.  *See* Exhibit K.  He describes Mr. Coppotelli as a "person of integrity, kindness, and selflessness" who "has had a profound impact" on him and many others.  *Id.*  "He has always been someone who inspires those around him to be the best versions of themselves." *Id.*  He went to high school with Mr. Coppotelli and remembers a moment when a teacher asked the class about motivations for achieving goals and Mr. Coppotelli answered, "I want to be a billionaire, … [but] I don't want to be a billionaire to live in a mansion or drive a Lamborghini … I want to make people smile and make the world a better place." *Id.*  And although Mr. Coppotelli has not reached "billionaire status," Mr. Dietlmeier believes his charity work has made a positive impact on thousands of people, and he is an invaluable friend and community member.  *Id.*

Mateusz Warchol is an environmental scientist and close friend to Mr. Coppotelli.  *See* Exhibit L.  He describes Mr. Coppotelli as "the most positive, humble and hardworking person I know" who has "the drive to take care of anyone that's around him." *Id.*  During a rough period of unemployment, Mr. Coppotelli helped him financially by giving him a job and "never failed to make me feel like an equal when I felt useless …." *Id.*  He has witnessed Mr. Coppotelli's dedication to his family, especially his nieces and nephews, often refusing to go out with friends in order to spend evenings with his sister's children.  *Id.*  He is proud to write a character letter for Mr. Coppotelli and considers him a model American citizen.  *Id.*

Daniel Detore is a close friend to Mr. Coppotelli and an owner of a property maintenance company for multiple hospital campuses in Toms River.  *See* Exhibit M.  "We would never be able to perform the snow salting, plowing and removal responsibilities without Robert, his equipment

and staff." *Id*.  He asks the Court to consider Mr. Coppotelli's importance to the community, especially in the winter months, when considering sentencing. *Id*.  He describes Mr. Coppotelli as "dependable, honest and a man of character" who "will own up to his mistakes and never shirk from his responsibilities." *Id*.  He speaks of Mr. Coppotelli's charitable spirit and is confident Mr. Coppotelli "will make right any of his wrongs and continue to do good for his community." *Id*.

In sum, Mr. Coppotelli is beloved by his family and community.  All who are close to him believe in his goodness and that he is not defined by his actions on January 6.  Furthermore, everyone is confident that he will never again be before the Court, and they cannot wait for his full return to life.

### C.    Mr. Coppotelli Poses Little or No Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Coppotelli does not fit the archetype of a person who will commit new criminal offenses or recidivate.  And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended nor designed to predict recidivism."  U.S. Sentencing Comm'n*, Measuring Recidivism: The Criminal*

12

*History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, the Supreme Court in *U.S. v. Booker* has freed the judiciary to remedy this inconsistency. *See* 543 U.S. 220 (2005).

In addition to what has already been described about Mr. Coppotelli's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, defendants with a criminal history category of I who have obtained a high school degree, like Mr. Coppotelli, have only a ten-point-six percent (10.6%) recidivism rate. *Id*. Also, defendants with a criminal history category of I who were employed during the year prior to an offense, like Mr. Coppotelli, have only a twelve-point-seven percent (12.7%) recidivism rate. *Id*. Furthermore, defendants with a criminal history category of I who have no illicit drug use, like Mr. Coppotelli, have only a ten-point-eight percent (10.8%) recidivism rate. *Id*. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Coppotelli would commit any criminal offense in the future.

Beyond the statistics, Mr. Coppotelli personally presents no risk of recidivism. As detailed by his family and friends, Mr. Coppotelli has lived his entire life guided by principles completely incongruous with his actions on January 6. As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Coppotelli himself. Although he has felt crushing remorse for his actions, since his arrest he has kept his focus on taking responsibility for his actions, improving the lives of his family and the community through hard work, acts of service and charitable giving, and living out the principles of his faith through action. When one

13

considers Mr. Coppotelli's personal characteristics and nature in light of the aforementioned recidivism data, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor has become especially important in January 6 cases.  This District is well versed in the now one hundred twenty-eight (128) page sentencing comparison chart of all January 6 defendants.[2]  For sake of brevity and to focus the Court's attention, Mr. Coppotelli asks the Court to consider three (3) cases in which this Court and this District has already imposed sentences. Each contains important facts that distinguish Mr. Coppotelli's conduct and support a sentence of probation.

In *United States v. Kymberly Sylvester*, a case that was before this Court, Ms. Sylvester pleaded guilty to violating 40 U.S.C. §§ 5104(e)(2)(D) and (G).  *See* 1:24-CR-00102-JEB.  The government asked for a sentence of twenty-one (21) days of incarceration, thirty-six (36) months of probation, sixty (60) hours of community service, and $500 of restitution.  *Id*.  This Court sentenced Ms. Sylvester to twelve (12) concurrent months of probation and $500 of restitution. *Id*.  Ms. Sylvester's conduct was more serious than Mr. Coppotelli's conduct.  According to the Government's Sentencing Memorandum,[3] before she entered the Capitol, Ms. Sylvester was

---

[2] Available at https://www.justice.gov/usao-dc/capitol-breach-cases.
[3] A Statement of Offense was not available on PACER Case Locator for this case, so the factual details are taken from the "Factual and Procedural Background" section of the Government's Sentencing Memorandum.

texting with another person and used phrases such as "show of force," "scare them," and "marching to congress" were used. *Id.* at ECF 22. At approximately 2:22 p.m., Ms. Sylvester entered through the Senate Wing Door and stayed inside the Capitol for approximately one (1) hour. *Id.* While inside, Ms. Sylvester walked through the North Crypt Lobby, Main Door Hall, Statuary Hall, Capitol Rotunda, and Crypt, even though smoke was filling some of those rooms while police officers attempted to disperse the rioters in her vicinity. *Id.*

In contrast with Ms. Sylvester's conduct, here, Mr. Coppotelli did not engage in threatening text message conversations with anyone on January 6 right before going to the Capitol. Unlike Ms. Sylvester, Mr. Coppotelli was only inside the Capitol for twelve (12) minutes, stayed within the area of the Crypt, and followed police officers' directions as he exited the building.

In *United States v. Daryl Graham*, a case that was before this Court, Mr. Graham pleaded guilty to violating 40 U.S.C. §§ 5104(e)(2)(D) and (G). *See* 1:24-CR-00366-JEB. The government asked for a sentence of fourteen (14) days of incarceration, thirty-six (36) months of probation, and a $500 fine. *Id.* This Court sentenced Mr. Graham to nine (9) concurrent months of probation, a $500 fine, and 100 hours of community service. *Id.* Mr. Graham's conduct was more serious than Mr. Coppotelli's conduct. According to the Statement of Offense, Mr. Graham spent approximately an hour loitering within the mob around the scaffolding and Upper West Terrace while the mob bypassed law enforcement and moved deeper onto Capitol grounds. *Id.* at ECF 15. Then, Mr. Graham entered the Capitol and moved through the corridors with the mob while he recorded with his phone in one hand and held a "STOP THE STEAL" sign in the other hand. *Id.* A few minutes later, Mr. Graham and the mob were forcefully removed from the Capitol by police

officers.  *Id.*  However, instead of leaving the Capitol grounds after witnessing the violence and chaos, Mr. Graham remained on or near the Upper West Terrace for at least another hour and a half until officers were finally successful in removing him and other rioters from the grounds.  *Id.*

As opposed to Mr. Graham's conduct, Mr. Coppotelli did not loiter on the Capitol grounds for an hour before entry, did not record the mob using his phone while inside of the Capitol, did not carry any signs, did not have to be forcefully removed by law enforcement from the Capitol, and did not loiter for another hour and a half on Capitol grounds in opposition to orders by law enforcement to disperse.

In *United States v. Ulises Wilkinson*, a case that was before United States District Judge Jia M. Cobb, Mr. Wilkinson pleaded guilty to violating 40 U.S.C. §§ 5104(e)(2)(D) and (G).  *See* 1:23-CR-00283-JMC.  The government asked for a sentence of sixty (60) days of incarceration, thirty-six (36) months of probation, sixty (60) hours of community service, and $500 of restitution. *Id.*  The court sentenced Mr. Wilkinson to twelve (12) concurrent months of probation, $500 of restitution, and 40 hours of community service.  *Id.*  Mr. Wilkinson's conduct was more serious than Mr. Coppotelli's conduct.  According to the Statement of Offense, throughout the day on January 6, Mr. Wilkinson held two signs stating "Move Mitch! Get out the way!" and "Free Assange!" in large black letters.  *Id.* at ECF 25.  Mr. Wilkinson approached the West Plaza of the Capitol with other rioters and took photographs with his cell phone of the damage being caused. *Id.*  At 2:35 p.m., Mr. Wilkinson entered the Capitol through the Upper West Terrace door and went to the Rotunda area, where he took pictures of rioters assaulting U.S. Capitol Police officers. *Id.*  Mr. Wilkinson went to the third floor, witnessed rioters fight with officers, and then entered

16

the Senate Gallery and took pictures. *Id.* Then, Mr. Wilkinson went back to the Rotunda, lifted his signs and paraded around, chanting "1776," and watched officers attempt to clear rioters out of the building for approximately ten (10) minutes before he exited the Capitol. *Id.* He was inside the building for a total of forty-two (42) minutes. *Id.*

As opposed to Mr. Wilkinson's conduct, Mr. Coppotelli did not have signs, did not take photographs, did not chant inside the building or wander into the Rotunda or Senate Gallery, and was only inside of the building for twelve (12) minutes and followed officers' directions while leaving.

In its Sentencing Memorandum in this case, the Government asks this Court to sentence Mr. Coppotelli to fourteen (14) days of incarceration, twelve (12) months of probation, sixty (60) hours of community service, and $500 of restitution. The Government cites three (3) cases in support of its sentencing request and contends the defendants' behaviors in those cases are comparable to Mr. Coppotelli's behavior in this case. However, the Government's three cases are not comparable.

First, the Government cites *United States v. Ruben Reyna*. *See* 1:23-CR-00350-CKK. Although the defendant pleaded guilty to a different charge than Mr. Coppotelli, the differences do not end there. According to the Statement of Offense, the defendant arrived on Capitol grounds at 1:00 p.m. and posed for photographs with other rioters while holding up four fingers, signifying four more years of a Trump presidency. *Id.* at ECF 17. After witnessing the beginnings of the mob's altercation with police, the defendant joined the mob that was advancing on the Capitol. *Id.* He admitted to the FBI that he felt he was approaching a threshold that should not be crossed when

17

he reached the Capitol's Upper West Terrace.  *Id.*  Even still, he took photos and videos of the crowd, and one video captured him singing with the rioters.  *Id.*  At 2:53 p.m. the defendant entered the Capitol building through a broken window next to the Senate Wing Door.  *Id.*  While standing inside the broken window, he took photos of the interior of the Capitol which showed officers attempting to contain the mob.  *Id.*  He later posted that photo and others to his Facebook page, with captions including, "#OurHouse" and "#StopTheSteal."  *Id.* Although the defendant was inside the Capitol building for approximately one minute, he still remained on the Upper West Terrace for approximately ten minutes before finally leaving the Capitol grounds.  *Id.*

Next, the Government cites to *United States v. Victor Martinez.  See* 1:23-CR-00039-TSC. According to the Statement of Offense, at approximately 2:42 p.m., the defendant was part of a mob that was attempting to push past police officers outside the Rotunda doors.  *Id.* at ECF 18. The defendant and the mob overran the police officers and entered the Capitol.  *Id.*  He went to the Rotunda and participated in singing and prayer with fellow rioters.  *Id.*  He wore a "Trump 2020" flag like a cape around his shoulders.  *Id.*  He walked around the Rotunda from 2:42 p.m. until 3:18 p.m., then finally exited the Capitol via the east front Rotunda doors at approximately 3:33 p.m.  *Id.*  The defendant was inside of the Capitol for a total of approximately fifty (50) minutes, *id.*, over four times the length of time that Mr. Coppotelli remained inside the building.

Finally, the Government cites to a case that was before this Court, *United States v. Eric Harrower.  See* 1:23-CR-00240-JEB.  According to the Statement of Offense, when the defendant approached the Capitol, he climbed to the top of a banister and, while there, held an overturned bike rack so that other rioters could use it as a ladder to climb the banister.  *Id.* at ECF 21.  Those

same rioters then used the banister to access the staircase leading to the Upper West Terrace.  *Id*.

At about 2:09 p.m., those same rioters pushed past law enforcement officers that were attempting

to keep rioters away from the building.  *Id*.  At approximately 2:15 p.m., two minutes after rioters

first forced their way into the Capitol building, the defendant entered the building through the

Senate Wing Door.  *Id*.  He was among the first group of rioters to make entry into the building.

*Id*.  The defendant proceeded to the Crypt and was there from approximately 2:25 p.m. to 2:34

p.m.  *Id*.  He then exited the building through a broken window near the Senate Wing Door at

about 2:36 p.m., 21 minutes after entering the building.  *Id*.  However, he remained on the Capitol

grounds until approximately 4:00 p.m.  *Id*.

      In no way minimizing Mr. Coppotelli's conduct, it is important to note that the few minutes

he spent inside the Capitol that day do not place him anywhere close to the "extreme behavior"

side of the spectrum of January 6 defendants.  He did not pose for, take, and post photographs to

social media like Reyna, and did not remain on Capitol grounds after exiting the building. He did

not actively play a part in a mob overrunning police officers like Martinez, and did not use

government property to personally assist other rioters in forcing their way past police like

Harrower.

      The facts and context of this case and his life suggest that Mr. Coppotelli was caught up in

a regrettable and emotional moment he had not planned for, and the evidence does not support the

contention that he went to the Capitol that day for the purpose of violence and destruction or

committing any crime.  Considering the facts of the aforementioned cases, Mr. Coppotelli asks

this Court to sentence him to a term of probation.

19

### E.  Mr. Coppotelli's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  There is no need for personal deterrence in this case, as Mr. Coppotelli has endured severe regret and shame in experiencing his loved ones' and community's reaction to his conduct on January 6.  Mr. Coppotelli, a devoted family man, community member, and business owner had his life's worst mistake be publicized nationwide, painting his reputation as one that is so far from who he truly is.  Furthermore, Mr. Coppotelli is not the type of person who would commit any further crimes in the future, as the recidivism statistics demonstrate.

Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Coppotelli's offense simply by charging and convicting him.  As a result, numerous media outlets will discuss Mr. Coppotelli and the substance of his offense, as they have done in the past.  Further, Mr. Coppotelli will be discussed in various conversations and settings among family and friends for years to come, a shameful reality from which he simply cannot escape.  In short, Mr. Coppotelli's public demise sends a strong message to anyone who might attempt such conduct in the future.

## VI.    CONCLUSION

Considering the above, Robert Coppotelli respectfully requests that the Court impose a term of probation in this matter.


Respectfully submitted,

20

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
Tel: (202) 731-9882
Fax: (202) 664-1331
David@PriceBenowitz.com
Rammy@PriceBenowitz.com

*Counsel for Robert Coppotelli*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 29th day of November 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.


_____/s/_____
David Benowitz